171498, Atlantic Richfield v. Christian. Ms. Blatt? Thank you, Mr. Chief Justice, and may it please the Court. This case involves whether the hundreds of thousands of landowners on Superfund sites can bring State lawsuits to implement their own piecemeal hazardous waste cleanups. The answer should be no. CERCLA entrusts EPA to protect human health and the environment by developing a remedial plan that protects the whole community. Respondents are profoundly wrong that removing waste is always better than leaving it in place. Superfund sites contain extremely hazardous substances—lead, mercury, plutonium, to name a few. Excavation, transportation, and disposal of these substances is risky—not only to neighbors, but the millions of people who live next door to Superfund sites. Whether these risks are worth any benefits should be evaluated by EPA, not juries on an ad hoc basis. Since 2013, EPA has objected that Respondent's Restoration Remedy would support more than three decades of its efforts at the Anaconda site, including by digging up soil that EPA wants left undisturbed and by building miles of underground trenches that would affect an entire community's groundwater. This Court should reverse for three reasons. First, Section 113 bars Respondent's challenge to EPA's remedy. Second, Section 122 bars Respondent's from undertaking any remedial actions absent EPA's authorization. And third, a Restoration Remedy is preempted because it would require Atlantic Richfield to effectuate the very cleanup that Federal law prohibits the company from doing on its own, and a Restoration Remedy would prevent EPA from carrying out its statutory mandate to implement comprehensive cleanups. Sotomayor, Ms. Plath, I've been trying to unpackage this case in my own mind, and I start with the language of the statute. I'm sorry, I interrupted. You finish. No, we're good. Okay. I'm sorry. No. I am trying to figure out, let's assume for the sake of argument that the Restoration Remedy, the remedial plan that the State court orders supplements rather than contradicts the EPA plan, that it was something in top of. I read the savings clauses to permit that. The savings clauses are very explicit that it's not displacing or intending to displace State law remedies for liability or for anything else. So if these plans supplement, why would this part of Montana law be preempted? So in terms of preemption, so it's quite emphatic to understand that Section 122E6 and the over 20 administrative orders impose both a floor and a ceiling on the type of If I disagree that it's a ceiling, if I think it's just a floor, and that the EPA has the power to decide whether any plan can supplement its own, where does that leave this argument? If I believe that it's a floor only plan, where does that leave this argument? If I believe that it's a floor only, not a ceiling, that the EPA has the right to establish when a plan will be a ceiling, where does that leave this case? Okay. So in terms of conflict preemption, so we know that EPA would absolutely have to change Federal law, which it could, to approve their plan. So you are absolutely correct that EPA Federal law requires a specific action level and a specific amount of dirt that can be dug and that no wall can be built. If that happens, yes, an EPA can change it. And this Court in Mensing said that courts do not withhold preemption based on the speculation that a Federal government may change the law, and the law would have to be given to the law, Ms. Blatt. It's the EPA's Superfund plan for this site. The specific things that you mentioned are not in the law. They are in the EPA's plan. And if the EPA said, we permit what the landowners, the further cleanup the landowners want, we permit it, or we permit what they want with certain modifications, if EPA says yes, then there's no preemption that I can see that would be involved in this case. Blatt. So that's not correct because when you said plan, and maybe I misspoke, the law is not a U.S. Code law. It's a binding administrative order where Atlantic Richfield would incur massive penalties every day if it violated. It's a law in terms of an administrative order that sets forth the plan. Now, Atlantic Richfield cannot carry out that plan without massive fines and violating law. In the order, it says undertaking any action without EPA's approval violates the order. And under ordinary permits the EPA approves. The EPA says what you want to do is okay with us, or at least, as was suggested in the briefing, part of what the landowners want is okay with EPA. So all of the pillars of their plan violate EPA's order. And your supposition that EPA could approve it is just not the test under preemption. The test under preemption is whether a party today could independently do under Federal law what State law requires. And I mean by that, and what this Court in Mensing and Bartlett said, that means complying with State law duties without the government's assistance and permission. Well, Ms. Blatt, same kind of question. Maybe it goes to a bunch of your arguments. I mean, look, if I were writing this statute, I would say it all goes to the EPA. It's just, you know, that's the sensible solution, to have one party that makes all the rules in this. But I'm not writing the statute. And the statute has three savings clauses in it, which suggests that the States have a significant role in this, and in particular one that says that the States get to impose additional liability or requirements with respect to the release of hazardous substances. And I guess, you know, one way into this is if I, if we imagine that this was done not with a damages rule, but suppose the Montana legislature just said, you know what, this plan that the EPA has put in place, it requires arsenic at a certain level, and we think it would be better to lower that. And we don't really care that the EPA thinks that that would not be a good idea for health purposes as well as for economic purposes. We think that that arsenic level should be lowered. Do you think that the State gets to do that? No. And Section 121 deals with this directly. It spells out in like over 3,000 words how States can incorporate into EPA's, their plans, and EPA can override that State standard. And it goes to the States have the remedy to sue. It's one of the exceptions under 113. And so, and I think you're right that their position under the savings clause is that not only could State laws say don't enact EPA's a different remedy, but State courts could order independent warring cleanups, you know, case by case, block by block, house by house. And this Court in the Abilene Cotton case and in the AT&T case interpreted almost an identically worded savings clause and said you can't interpret those clauses to completely destroy other parts of the Act. And this would utterly destroy EPA's whole design of the surplus. What do they save, then? I mean, the savings is all over this statute. They have to save something. What do they save that States can do independently? So let me be very clear how narrow our argument is. They have four claims of compensatory damages and punitive damages. So typical State law claims for nuisance and whatever else they want to claim for damages is fine. The objection here is that the actual remedy orders Atlantic Richfield to pay respondents to carry out their contrary plan and that respondents under State law must actually implement the very plan that Atlantic Richfield would violate Federal law. So this is a, not only a challenge and not only its direct remedial action that has to be taken in violation of 122, but it's the only claim that would meet our standard of conflict preemption, because it requires Atlantic Richfield to effectuate a violation of Federal law, either whether they hire their own employees or whether they hire the plaintiff's employees and put a different hard hat or give them a different shovel. Sotomayor, if I have questions about what State law requires, because I can't find anything in the State law that requires a damages remedy to be put in trust for the remediation. That's what the court below said. I know that's what it said, but I can't find any law that says that's what has to happen, number one. Number two, I can't find any State law requirement that the petitioner has to prove that they're going to actually use the money they're awarded for the purposes that they claim. So I'm very confused about the State law. And I think that's all a fair question. Sotomayor, if it is a fair question, why is it preempted? Meaning, why wouldn't I just remand this case and say you can't make, you can't award damages unless the other side proves or the side claiming these damages proves that it can get EPA approval of whatever it wants to do and that it will, in fact, only use that award for those purposes? Right. So I'm What's wrong with a ruling that's just that basic that says you can get more if you can prove the EPA will give you more? As simple as that. So you know What's wrong with that kind of opinion? So you took this case on the assumption, and we cite it on page 16 of our reply brief, all the places where the respondent concedes and the Montana Supreme Court expressly said that this money has to be used to carry out the remedy. And that's the way this case comes up. If you want another reason for sunburst, it's because of the reasons personal. So if you own a property and love it so much and you don't have any damages, the whole point of the restoration remedy to avoid the windfall is you have to spend the money. So I'm quite confident that I'm accurately stating Montana law and the respondents never argued to the contrary. And in our reply brief, again, we cite all the concessions, including I think the opinion below in three places says the money has to go to a trustee and that money has to be spent on the cleanup. And I'm agreeing with you that key to the preemption argument is that under State law, they will be forced to carry out a remedy that would violate EPA's orders, these administrative orders, if we carried it out itself. So what's wrong with an opinion that we write that says what you're missing is the next step? You have to be able to show that that remediation will be approved. Yeah. So So if that's their burden, why do we need to go any further? So I have two responses. So right now they don't have Federal permission. And under Section 122, you have to take Federal I didn't say We're talking about preemption They have to show that they will get EPA approval. And all I'm saying is, you know, today, let me just make one other point as a practical matter. This is not a case in its infancy. It was cooked. It was about to go to trial. It was three weeks away from jury selection when the court got stayed. We know they're going to trial. And the whole case is about whether a different remedy should be put on. And we know under State law, because they've conceded it, that they have to carry out that remedy. And we know they don't have EPA's permission. So you not only know two things. You know, again, it's conceded that the remedy seeks something different. And it would require a change in Federal law. And you know they never got EPA's permission. And I guess this is assuming we're not even getting an answer. Breyer. The answer, I think, is this right, to the question, which is a question I had, too, is that in order to bring an action where the result will be an order to do certain things, dig dirt or do physical things, if they are a potentially responsible party, they have to show not that EPA might approve it, but what it says is unless that such remedial action, which is the reaction they're seeking, has been authorized by EPA. And you know today that It has not. Not only has it not been, they never asked EPA. And therefore, what we should do, if you are right on the potentially responsible party, is we should send it back and say they have to get that permission from answer the other questions. Is that right or wrong? That's wrong, and I disagree. You already know today they don't have it. And just as the case sits today, whether they could have brought some separate Federal lawsuit after they asked EPA's, excuse me, State lawsuit, but you already know today that they never asked for it. That's why I say we'd send it back. They do not meet that requirement if they are potentially responsible parties. So dismiss the case. Now, if that, if you win in that respect, I'm asking if there is a need to reach the other two questions. I suspect there isn't, but am I right? Yes. If you rule for us under Section 122 that they can't carry out their restoration remedy because they don't have EPA's permission, then that's sufficient to resolve the case. Fine. Now, they say they are not potentially responsible parties, but you say they are. Why? Because in three, because they are landowners with hazardous waste on a Superfund site, and three provisions textually equate all persons who are owners and operators under 107 because they own land on a Superfund site. But they say they are not potentially responsible. Perhaps they were potentially responsible, but they are not potentially responsible because EPA and everybody else has told them they are not responsible. So no, and here's why. Potentially responsible parties has always been understood by this Court and everyone else as a status, not whether you could be liable. And their rule that says could you be liable at any given point in time is not only unheard of, it's unworkable, because you would never know whether a court would accept a defense including one. Whether they were or they weren't potentially responsible parties, they are landowners, correct? And do I understand correctly whether they are PRPs or not, if they are landowners, they can't take any, they can't make any change without EPA approval? They can't take a statutorily defined term called remedial action that's defined in 101-24, and it defines what a remedial action is. So they can do ordinary things to their property. They can't do the major upheaval of 500,000 tons. Whether they are PRPs responsible to someone else or to the EPA, whether they are continuous landowners or something else that exempts them, that's my bottom line, which is the mere fact that they want to take some action on their land that's remedial, they would have to get EPA approval. Absolutely. And PRP status, it doesn't Can you point me to the provision that says that, that says whether they are PRPs or not, as long as they are landowners, if they are going to take any remedial action on their property? Sure. So 122E6 is the one that says PRPs have to have EPA's permission for any remedial action, and then the 107-122A, 122E1, and 105H4, H, excuse me, H4A is the owners and operators under 107 with PRP status. Thank you, counsel. Mr. Michel. Thank you, Mr. Chief Justice, and may it please the Court. The United States is here because the narrow aspect of Respondent's suit that is before this Court, namely the request for a distinctive State law remedy under which a jury may authorize a plan to clean up toxic contamination at a Superfund site in a way that conflicts with, and in many respects physically destroys, the EPA plan selected under CERCLA, squarely conflicts with CERCLA, and would jeopardize EPA's cleanups at this Superfund site and other Superfund sites across the nation. Now, to go to some of the questions that have been raised already, this is a narrow argument here is narrow. The statute does have savings clauses, and we don't dispute that Respondents can move forward with their claims for money damages under State law nuisance and tort and other related theories that don't call into question the EPA remedy. And likewise, as Justice Kagan pointed out, there are a number of mechanisms in the statute for States to adopt what are called ARRs, applicable and or relevant and appropriate standards that could be implemented as part of the EPA cleanup plan. And I think that goes to a broader point, which is that CERCLA really lays out a two-step process. At the first step, EPA or whatever Federal agency is conducting the plan goes through a very reticulated process of getting public comment, meeting with landowners, meeting with the State, and selects a cleanup plan in compliance with those procedural and the substantive requirement that they protect human health. Then, at the second stage, CERCLA says go ahead and carry out the cleanup plan, and CERCLA erects a number of protections. Sotomayor, do you agree with Ms. Platt that your plan is both the floor and the ceiling? So I think it's not necessarily in every respect, but I think in the respect that matters in this case it is. No, no, no. Let me go back. Is it always the ceiling? I mean, an EPA... An owner can come to you and say I want to do more, and you can decide yes or no, right? Yes, absolutely. So it's not always the ceiling. I mean, yes. And in fact, the statute, as we discussed, as Ms. Platt discussed... So are you reading their State – are you reading this remedy as requiring the remediation that's awarded no matter what, with or without EPA approval? I think the Montana Supreme Court decision implies that Respondents could move forward with their claim as it now exists, even if they didn't have EPA approval. And we think that is a... How about if they did, if they could get your approval, if they could show that they could get your approval? I mean, if they could get our approval under 122e6, then we wouldn't have a problem with the suit. All right. How about if they're not a PRP? Let's assume they're a contiguous line. There's a whole set of arguments in these briefs by some of them. Putting aside whether they're a PRP because of the statute of limitations, which, you know, is not very compelling to me, okay, but putting that aside, let's assume that by definition they are a PRP. Or they're not a PRP. They're a continuous landowner. They're not a PRP. What about those people? So I think an important distinction is that if they were found to be a contiguous landowner, that would not take them out of the status of being a PRP. That would imply that they're not liable, as you pointed out. All right. So what you're saying is if you're a landowner, you might not be liable because some justices might have a problem with the concept that someone who didn't pollute and doesn't encourage the polluting would be financially liable. And that's an instinct that EPA shares. As we quote in our brief, the EPA has had a policy since 1991 of not imposing liability on residential landowners on Superfund sites. But — Ms. Osho, if I could ask about the PRP status, because there are obvious consequences of labeling somebody a PRP in the way that you suggest, that these sites, they can be sites for decades and decades and deprive people of doing some significant things that they want to do to their land. And the question, I guess, is why do we think the statute requires those consequences as to a person who has never been treated as a PRP by the government, who has never been involved in settlement negotiations, who under reigning law, including the statute of limitations, has no liability exposure? I mean, it would seem a big deal to take a person like that and say, you've lost some significant property rights. Why? So I think two responses. First, I do want to make clear that 122E6, the PRP provision that we're talking about here, only applies to remedial action. And that has a defined statutory definition. It's in 9601A4. Well, I said some significant things. So, you know, look, you can still, you know, make a garden. Absolutely. You can still make a garden. Now, as to significant things, I think it does make perfect sense that you wouldn't want somebody who lives on a Superfund site doing things in the earth that will interfere with the EPA remedy. Of course, you know, there is on a Superfund site a sort of butterfly flaps and swings problem where if you dig up two feet of soil on your land, you can kick up arsenic into the air, or if you dig a trench on your land. I completely take the point that that might have been a sensible policy decision for Congress to make. But as I look at these provisions, the only, where this PRP comes from is in a section that deals with settlement negotiations. And these people were not ever involved in settlement negotiations. Nobody for a moment considered that they should be involved in settlement negotiations.  So I don't think so, Justice Kagan. PRP is used in the statute a lot of different times, not just in the settlement. You're right that E-6 is under the settlement provision. But if you look at E-1, it equates owners on the site with PRPs. And so the Court could leave for another day whether PRP is coterminous with covered persons under Section 107 and simply decide that owners on Superfund sites are PRPs. And again, we think that makes perfect sense, because by definition, when you have a cleanup plan that takes into account an entire Superfund site, as this one does, and one landowner does something that affects the earth or affects the environment, it's going to spread across onto other parts of the Superfund site. And the water barriers that we've discussed in this case are a good example, where EPA has a considered plan to treat the water in a certain way, and respondents want to dig. I think it's an 8,000-foot trench that would change the gradient and that would physically change the land in a way that could endanger the whole Superfund site off of their own property. So it is true that when you live on a Superfund site and you have large amounts of toxic chemicals, you are more restricted in the kind of land use. But it seems a very indirect way for Congress to have gone about this, as Justice Kagan says, to, in essence, hinder a landowner from doing any significant action for decades. I mean, I think on — it's not that strange to see that an owner of a Superfund site, somebody who lives on a contaminated property, is hindered from taking remedial action, which is a fairly significant action, without EPA approval. Of course, EPA can grant approval, and EPA has in other cases granted approval for remedial actions on a Superfund site. So your two answers are, one, it's only significant action, and, two, EPA could grant approval. Absolutely. So it's a limited incursion to the degree that it restricts property rights. That's what comes with living on a Superfund site, and that's what's necessary to protect. Then what is your answer to the question Ms. Platt was asked? If we say the landowners are PRPs and they have to get EPA permission for any restoration that they want to do, if the Court said that, then I don't see that the further questions in this case need to be answered, and I don't see any reason to get into preemption. I agree with you, Justice Ginsburg. You could resolve the case by saying that Respondents are PRPs who need EPA authorization and don't have it, and therefore their claim fails. What do we do about the government's prior representations that permission might be granted for something like this? Well, I mean, the government stands ready to listen to any proposals from the landowners. They have not formally presented us with any proposals, so we're working off of the best available information, which is the expert reports that they have introduced in the State litigation. So it's still at least possible that the government might approve something like this? I mean, based on what we know, we've made very clear, we're now in the Supreme Court litigating this case, that we would not approve what we understand their plan to be. But we're not saying never. Of course, they could present something and we would listen to it. And I might have missed it, but I would just, when is the government's role here likely to finish in this particular site? So I think the government, the ongoing remediation will continue through 2025 is the latest, is the latest projection. It may be that, you know, there are continuing operations beyond that, but the active site remediation, we expect to continue through 2025. Is there a takings claim, do you think, that arises from the government's position that any remediation efforts for a period of, I guess, 45 years is prohibited by landowners? I mean, in the literal sense, there's no takings claim because they haven't raised one in this case. I think more broadly, of course, one could raise a takings claim, but I think it would be a very weak claim given that, in fact, EPA's remedy has improved the value of the property and that you have to start from the premise that the property is covered in arsenic. Well, it's improved the value of the property from its prior state, but not to the level that State law would allow. Well, I do think that that's an important point, Justice Gorsuch, is that the EPA plan fully complies with the State environmental laws. Those are the ARARs that I mentioned earlier. This is a separate private plan that a jury would have to approve. Thank you, counsel. Mr. Palmore. Thank you, Mr. Chief Justice, and may it please the Court. This Court lacks jurisdiction, but if it finds it has jurisdiction, it should affirm. Briefly on jurisdiction. The decision below affirming denial of summary judgment on one damages theory and remanding for trial is nonfinal. This Court has exercised review over Montana supervisory writ decisions only where reversal by this Court would end the case entirely. That critical condition is absent here. On the merits, this Court held and explained in CTS v. Wahlberger that CERCLA does not establish a comprehensive remedial framework. Instead, it leaves untouched State judgments about causes of action and the scope of liability for property damage. Montana, like many other States, has made the judgment that one who puts toxic materials on another person's property is liable for trespass and nuisance, and that a measure of recovery is the cost of removal. Nothing in CERCLA bars that core exercise of State authority to vindicate private property rights. ARCO's invocation of Section 113H fails. That's the challenge provision, because it doesn't apply in Federal court, and even in Federal court, it doesn't apply to State law claims. ARCO fares no better on Section 122e6, the PRP provision, because the landowners here are not potentially responsible for anything because they face no possible liability. And that provision certainly cannot be read to give EPA the vast power that it seeks, the ability to control forever the removal of a shovelful of dirt from a private landowner's backyard. There's no basis for preemption either. CERCLA establishes a floor, not a ceiling, on environmental remediation and in several provisions makes clear that Congress wanted to leave State law in place. Nor is there any impossibility. The duty that ARCO breached was the duty not to pollute. Nothing in Federal law required it to do so. Justice Sotomayor. I still have a problem, which is, it seems to me that if you own a piece of land and you know the EPA has been fixing it up, that whether you're responsible financially for the cleanup, that you shouldn't be able to interfere with the EPA's efforts, meaning you might have a takings claim, as Justice Gorsuch claimed, you might have some other claims, but I don't know how you can go about instituting a plan without obstacle conflict preemption, instituting a plan that interferes with what the EPA is doing. Your Honor, first of all, and this is critical, there is no interference here. The vast majority of my clients have had zero work done on their land, and if you put all their land together, the work has been done on only 5 percent. Okay? So on 95 percent of the land, literally nothing has been done. So there's no undoing there. On groundwater, EPA made the decision to do nothing to clean the groundwater in Opportunity. So we're not undoing a remedy. We're doing something that EPA, where EPA has done nothing. And what's the 5 percent? They dug down 18 inches, they put in clean soil, and they planted grass. All we want to do — Roberts, on the groundwater, I understand their position to be that if they did do something along the lines that you're proposing, it would have very significant adverse impacts. So the fact that they haven't done anything, that's what they want you to do. They don't want you to do anything. So you can't say having done nothing represents that there's no going to be no adverse impact from what you plan to do. A couple answers on that, Chief Justice Roberts. First of all, they decided if you look at the actual regulatory materials, and the EPA makes decisions in this area through records of decision, which are official documents, they say they didn't want to do the groundwater remedy. It was a different wall. It was a different one because it was technically impractical, which is a term of art under CERCLA for too expensive. In the regulatory materials, there is absolutely no finding that that wall, much less the one that we've proposed, which is different, would cause any environmental harm. If you look to what the government cites here for that proposition, if you trace it through, it's citing its own amicus brief and the Montana Supreme Court. If you look at the Montana Supreme Court amicus brief, the government cites literally nothing. So you're talking about the particular specifics in your case. But as a general matter, for example, you can understand that the EPA, looking at this, might say, okay, we're going to do this, going to do this, going to do this, and we're going to get to that as soon as we're done doing this other stuff. And yet someone else in your position would come in and say, well, you're not doing anything here, and so we're going to go ahead and do this, when the EPA's answer might simply be that, well, we haven't gotten to it yet, but we want to be the ones that decide what to do rather than the particular landowners there because we have a broader perspective affecting the whole site rather than individual sites where the people may reasonably want something to be done but still may be inconsistent with EPA's plan. Well, here, Mr. Chief Justice, the issue isn't we'll get to that later. They're done. All the remedial work, such as it was on our property, has been over for several years. They are completely done, and that's another reason why there's no interference with anything they're doing. They're finished. We're trying to move beyond your particular case. And I understand that. So one could imagine a different case involving a conflict preemption claim with respect to the EPA remedial orders. That's not this case. ARCO's argument here, which Ms. Blatt articulated, is that CERCLA itself establishes a floor and a ceiling such that any State law remedy that goes beyond, even one inch, beyond what a remedial order required is preempted. They are not making a very different argument that perhaps in a case like Your Honor is referring to could be made, which there could be an argument made that there's that case might look a lot like Geier, right? So if in a case EPA had evaluated various remedies and it had rejected a remedy because it said that remedy will cause environmental harm, so we choose not to adopt it. Breyer. No. The problem isn't, I don't think the problem they're stating is anything to do with preemption or anything. It's just whether someone in your position should first have to go and get the EPA's permission. And you talking about a shovel of dirt or something, suppose they did do something like that. Isn't there a remedy? It's called the Administrative Procedures Act. And you say here they made it an administrative procedure and it was arbitrary, capricious, and abuse of discretion. That way, as the Chief said, as others say, we channel all this through the EPA and the courts reviewing the EPA. And what we don't have is 10,000 juries or 50 States or whatever it is imposing sometimes conflicting duties and leaving it up to hundreds of different judges to decide. Your Honor, a couple answers. One is EPA doesn't need this 122e6, which is what you're referring to, to prevent harm at a Superfund site or protect the integrity of its remedy. The government made that point at page 17 of its invitation brief. It said we have plenty of tools. We can get administrative orders. We can get injunctions. There's no problem here. We can use those tools to protect the integrity of our remedy. The 122e6 applies only to potentially responsible parties. What is a potentially responsible party? It is not defined in the statute. So under normal rules of statutory construction, this Court looks to what does that mean? Is someone potentially responsible if they face no prospect of liability? No. They're not potentially responsible. It's been said they are covered parties. And who is a covered party that is not a potentially responsible party? We are told that this Court has equated the term covered party with personally responsible party, that a covered party is a potentially responsible party. And you say that's not right. They're not one and the same thing. So who is a covered party but would not be a potentially responsible party? There could be a number of ways. And you're right, Justice Ginsburg, that this Court has as shorthand used the two, linked the two. And the concepts are clearly linked. All potentially responsible parties have to at one point been covered persons. But a covered person would include a residential landowner with certain exceptions. Justice Sotomayor, you asked about the contiguous landowner defense. If you look at that, that is a carve-out from the definition of owner. So someone who establishes the requirements of that carve-out is not even an owner. So under ARCO's view, where all owners under Section 107 are potentially responsible parties, those who satisfy that defense and the bona fide purchaser defense aren't even owners. But more importantly, Congress could have said in 122e6 all 107 covered parties have to get EPA permission in order to remove toxic waste or arsenic from their land. It didn't say that. It said potentially responsible parties. It used a different term. Kagan. It did, Mr. Palmore. But under your theory, how would you decide whether somebody is a potentially responsible party? It sounds like you would need a court adjudication to do that. And that seems unlikely that Congress meant for that to happen. Well, Your Honor, I don't think it would necessarily need a court adjudication. And in fact, the statute puts the onus on EPA, this is Section 113k2d, to notify, identify and notify all potentially responsible parties as early as it can before taking any removal action. So here we're talking about in the 1980s. It's on them to identify potentially responsible parties and send them a letter. And when there are settlement negotiations, and you referred to this in Section 122, they have to identify all potentially responsible parties and include them. They never do. So you're saying that even in the absence of the statute of limitations issue, these would not be potentially responsible parties because the government is subject to a kind of estoppel principle? I'm saying that if there's some concern about how will we know who a potentially responsible party is, the government has tools to at least put people on notice that it thinks they are potentially responsible parties. Now, of course, it might be wrong. But in this case, though, we never got any of those kinds of notices. In the district court in this case, the government's brief said, we take no position on whether these landowners are potentially responsible parties. They own land that contains hazardous substances. I thought that potentially responsible parties are people who own land, whether they have any fault or not. But their land does contain hazardous substances. It does, Justice Ginsburg. And that makes them owners under Section 107, unless they are carved out from that definition by one of the defenses that we were talking about. That makes them owners. But 107 does not use the phrase potentially responsible party. And I think there's a critical kind of elephant in a mouse hole aspect to this argument. Section 122, and we reproduce all of it in the appendix to our brief at 50A through 80A, is all about settlement. If you read it front to back, it's all about settlement. And they've heard of it. Kagan, I understand Ms. Blatt, because I made that point to her. And I thought that she said to me that there are other places in the statute which use the term potentially responsible parties, so it's not all about settlement. There are a few others. Most of them refer back to the settlement provision. But I think that explains the purpose of 122e6 and also explains why it should be read according to its ordinary plain terms, which potentially responsible means potentially responsible, means like someone who could be liable, which is that when there are settlement negotiations and EPA has notified all the PRPs of the settlement negotiations and included them, something they've never done here, we've been excluded, then they don't want these parties who face possible liability and therefore are in settlement negotiations to go off and do their own remedial work. Alito, you think a party could be potentially responsible at one point but then at a later point cease to be potentially responsible? Absolutely, Your Honor. I do think that. That's inherent in the next sentence. What would that make with respect to a rule limiting the ability of that party to engage in remediation that's not consistent with the EPA plan? Because, Your Honor, first of all, that's the way statute of limitations work, right? Parties get reposed when the statute has passed. And I think you have to understand the implications of the contrary position, which is you ask the question when will this plan be over. It's already over on our land. The plan overall is targeted to be completed in 2025. But it's never over because all of the arsenic and other contaminants will not be removed. There is a five-year review process where more remedial action could be taken. ARCO could be required to do it. And that will go on literally forever. So the argument on the other side is that EPA has a permanent easement on my client's property requiring them to store ARCO's arsenic and lead forever unless we get EPA permission to remove it. Can I go back to Justice Kagan's question for a second? If EPA notified landowners early on that they were all PRPs and you disagreed, how would that be resolved? Well, I think we would then, I think it kind of depends on how it comes up here. This PRP issue is coming up in an odd posture in this case because I think it's critical to point out that what we're talking about here is, one, a measure of damages, right? These are trespass and nuisance claims. And under Montana law, we have the default is diminution of value. But if we can establish that we have personal reasons for wanting to stay on our property and remove the arsenic, then we can get this other measure of damages, restoration damages. And then it comes in, ARCO has argued that as like a defense to that. I think her question went to it would be odd to think that the statute creates uncertainty about who is subject, who is a PRP and who isn't, given who needs to get approval from EPA to do improvements on the land. You would want certainty at the front end. And if you can disagree and, as she said, go to court, that seems unusual for this statutory structure. Well, Your Honor, of course, EPA has the ability to provide some measure of certainty. It at least can put people on notice that it believes they are PRPs. It's actually obligated to do that under the statute. And it didn't do that here. Right. But even if they do, there's disagreement that would have to be resolved somehow with satellite collateral litigation, I think, or else we'd be back in the same spot decades later. Perhaps, Your Honor. But I think that the assumption behind those kinds of questions is that EPA critically needs 122e6 in order to effectuate its goals on the superfund site. And that's not correct. Kagan. Would you think it would be an appropriate rule if basically it were up to EPA to designate potentially responsible parties, or at least that there were a strong presumption that if EPA designated somebody as a potentially responsible party, they were one? I don't – they certainly don't have the power to do it unquestionably because it's a defined term under the statute. So they did send us such a letter as a litigation filing, as a letter to counsel right before the cert petition in this case was filed. And so I don't think that – that's not binding because they're wrong. We're not potentially responsible parties. And it also came decades after they were supposed to do that, and they've never treated us as potentially responsible parties. But at least that would define a universe if done properly according to the statute. Yeah. I actually – you're quite right. I was not clear enough in my question. I actually meant as – that they would designate somebody as part of putting together the settlement negotiations that 136 is all about. Absolutely. That would at least allow them to identify the universe and put people on notice that – You have a problem knowing you are a – your clients are landowners of land that is polluted and is a Superfund site. They know that. Yes. And you're a good lawyer. I wouldn't think there was actually a problem of their being ignorant. Maybe there is. I don't know what it is. I haven't seen it. So does it boil down to – and you've said this, but I don't think you're right – that on the one hand, you said EPA gets some kind of permanent easement on their property to tell them what to do. But isn't that an overstatement? What EPA can do is they can say, we don't want you physically to change this land. And if you think that they are unreasonable, you go to court. That's their side of it. And you say they're unreasonable. Okay? That's simple. And most people can do that. And if you win, then it's really about the same thing. You can go and say, look, we, under our Montana statute, believe that we should not just get money, but we should get money that is earmarked and must be used to make physical changes in the property. That's the problem. And if you can do that, it may be easier to get. But the problem is that there could be many States that have that, and you can't run it in a central way. Have I stated correctly what the issue is? Perhaps, Your Honor. First of all, a couple of answers. One is Congress wanted to allow State law to proceed. They did for damages, there's no doubt. But is there any indication they wanted physical changes to be made by 40 different entities? Yes, Your Honor. If you look at section 114B, which is a no double recovery provision, Congress contemplated that there would be State law recovery for removal, and the only limit put on it was that there be no double recovery. Congress knew that there could be State law recovery for removal, and it allowed it to continue. And also, I think the the the But what Mr. Palmore of the argument that what the State court might order conflicts with what EEOC, with what the EPA. For one example was given here. You want more arsenic removed. EPA said that that would involve danger, there would be additional hazards. The problem with not having EPA as the overall supervisor means that there can be clashes between what State law says is okay and what EPA says should be the proper treatment. Justice Ginsburg, of course, if EPA thinks that a remedy is going to cause harm, as it said in its invitation brief, it has ample tools to stop it. Second of all, there simply in this case, that might be an issue in another case. In this case, there is no such finding in any of the regulatory documents of environmental harm. They just said we're going to go this far and no further. They didn't reject any, they didn't reject our permeable wall to clean the groundwater. They didn't say we can't do 24 inches, much less did they say that any of those things would cause environmental harm. So one can imagine. It becomes a moot question if it's your obligation to ask them. Meaning if you are a PRP and that's what we conclude, it would be your obligation to ask them for permission. So if Ms. Flatt is right that the award here, assuming you were to get one, were conditioned on you being a PRP and any action you took had to be approved by the EPA, what damage does this do to you? You would have administrative remedies to challenge their denial of any activity you wanted to take. That would be litigated by a court, but at least there would be clarity. Sotomayor, I'm not sure I understand your argument. Landowners on super site funds, before you interfere with the EPA, get their approval, or before you attempt to or before you attempt to do anything, get their approval. What's wrong with such a rule? Well, Your Honor, of course, our position is we're not required to get approval because we're not PRPs. If we lose on that, and if you conclude we also are not contiguous landowners, which carves us out of the definition of owner. Well, their argument is all owners are PRPs. If we're not owners, we're not a PRP. If you assume away all of that, then it's really a State law question. This is a State law question. No, it's not a State law question. We would hold that it would conflict with Federal law, with Federal rules, if you go preemption stops you from taking any actions that are not approved by the EPA, period, end of case. The reason that would be a remand question, Justice Sotomayor, is because we haven't asked the EPA for that permission, because we don't believe we are PRPs, and in fact, EPA itself took no position on whether we are PRPs in this very case. So we might be able to get in the district court in Montana. I thought their whole brief said you were. In the district court in Montana, the U.S. Government said we take no position on whether landowners here are PRPs. Their position has changed dramatically over time. What I'm saying is we never had any reason to seek their permission. If you were to hold that we need their permission, then we, A, we might get it. They've said before that there are aspects of our plan they could approve. And, B, to the extent that there's uncertainty about that, that is a State law question, because, again, all we're talking about here is whether. No, it's not a State law question. It's a Federal question. Sotomayor, we have said there's a conflict. It's a Federal question. It's a Federal question embedded in a State law question, because the State law question is do we intend to use this money to clean up our land, and that prevents windfalls. That's the Montana Supreme Court's decision in Sunburst. What they're saying is, well, you may not get EPA approval to clean your land, so you wouldn't actually be able to do it. How that uncertainty, that possibility of need for EPA approval would be factored in to the damages calculation is a State law question. If I could return to Justice Breyer. I'm sorry, Justice Gorsuch. Well, before you do that, I just was hoping you might return to Justice Ginsburg's question. And let's suppose for the purposes of this hypothetical that you're not a PRP, but that EPA thinks that some aspects of your plan would interfere with its interests. You said that the EPA has plenty of tools available to it in that scenario to address any conflicts. Can you be specific about what EPA could do to take care of its interests in that scenario? Yes, Your Honor. And you don't have to take my word for it. Because 122 won't work, right? You don't have to take my word for it. You can look at page 17 of the government's invitation brief in this case, where it said you don't need to take cert on this PRP issue because we have plenty of tools in order to safeguard the integrity of our remedial plan. Those are under section 106. It can seek administrative orders. It can seek injunctions. There are plenty of tools. Can it do that even with respect to somebody who's not a PRP? Absolutely. If someone is going to do something that's going to release toxic substances into their neighbor's property or into a creek or something, then they have plenty of tools to address that. They don't need this ongoing supervision. And that ties into a part of Justice Breyer's question, which I didn't ask yet. I think the answer yet, which is you were asking about, well, couldn't they get approval, and why is this, why is, might this be a taking? It depends on what the default rule is, right? Where does the property right lie? Does it lie with EPA? Or does it lie with the landowners? Under Montana law, we have a right, a wrongdoer has put arsenic on our land, and we have a state law right to get a judgment sufficient to remove it. It's not, that's not applying the CERCLA health standard. That's applying bread and butter Montana property law. Am I right that your answer to Justice Gorsuch's question really just turns on who has the burden? Under your theory, EPA has the burden to initiate proceedings under the other side's argument. The landowner has the burden to go to EPA first. Is that an accurate way of looking at it? That is, Your Honor. So they, the presumption is, we are private property owners, that we have control over our own property, and we can remove arsenic on our own property if we want to. Nothing in their 122E6 argument. The question is whether CERCLA displaces that presumption. Whether CERCLA displaces that forever. Right. Right? A thousand years from now, under their view, we would, if we wanted to remove a shovel full of dirt. But either way, sorry to interrupt, either way, EPA would have the say. It's just whether EPA initiates or you go to EPA. I think you just said that. Yeah, but I think the default rule is critical, right? I mean, we have the bundle of property rights. Yeah. And if we, you know, commit an environmental offense, then EPA as a regulator can use its power to go after us. What would the test be? What would the legal standard be? If they went after us, it would be a violation of CERCLA. These are the, this is what, and the government itself took the position that those tools are fully adequate here to protect the integrity of the remedy. It's likely to be pretty complicated. And if we, one way, it's central. Everyone goes to EPA and there's a central reviewing court. The other way, you want EPA to go to any place where a landowner has a law in his favor, lets him do some things, and EPA is going to have to prove that this particular thing in each of these cases is a CERCLA violation, which is already a standard that's, it might not. It might just be an interference with their plan. It might just be raising the cost of their plan. It might be, who knows? I'm not an expert in this. But that's, that's the question. How did Congress want this to work? Right. And one could imagine Congress writing a statute to give EPA complete control, but it didn't, it didn't do that. And they might have used the words potential responsible person has to go to EPA, and by that meant that those people who live on owned property on a toxic waste center, that's what they argued. Right. Your Honor, their position is that every single private property landowner in this vast 300-square-mile Superfund site has to get their permission to remove even a shovelful of dirt from their backyard. No, I don't believe that. That is page 34 of the blue brief. ARCO says remedial action covers virtually any physical action with respect to hazardous waste at the site, including storage, excavation. It has a list there. It's virtually anything. They're saying that are, my clients in Opportunity, Montana have to get permission from EPA in Washington if they want to dig out part of their backyard to put in a sandbox for their grandchildren. And are you saying also it's a no? You can say dig out, you can say dig out part of their backyard. EPA would say if you want to disturb arsenic-infected land, dirt, in a way that would not only harm your neighbors but could harm people many, many miles away. I mean, yes, you want to just do things on your land, but you can't overlook the fact that that is going to have harmful effects on everybody else around you. And if you assume that harm that's assumed and embedded in your question, they have the tools to go after that. What I'm talking about is when there's no showing of harm. Their argument is whether there's harm or not, we have to get their permission. And if I could just — I guess the question, though, is — and, you know, you might say, look, this is a policy matter and Congress decided it, but I guess the question is it's hard for EPA to go around and try to figure out who's creating sandboxes. And so why should the onus be on EPA to figure out who's creating sandboxes? Well, EPA is, of course, all over this site, and it can enforce the law here. The question is whether we are — should be similarly situated to just you and me and any American who, if we violate the law, the regulator, the law enforcement can come after us, or whether we have this kind of superintending presence of agency authority over us and our private property for the rest of our lives. And that's not what — that's not the scheme that Congress created. It went out of its way to allow State law over these traditionally State law subjects to continue. But your — your parade of horribles can still come true with EPA being aggressive and getting to all those places. So the really — If they want to come out — You're right. Your question, Justice Breyer asked, is does it make sense to have you go to EPA first so that they can maintain control? Comprehensive is the word in the statute, after all. Your Honor, there's no evidence that Congress intended this obscure corner of Section 122 about settlements to give EPA that kind of vast control forever over private property. Thank you, counsel. Three minutes. Ms. Black. Thank you, Mr. Chief Justice. Justice Sotomayor, I answered one of your questions incorrectly on a site, and I need to correct it. Section 107Q1, capital A, three through five, is the contiguous landowner provision that says if you live on a Superfund site, no matter what, you have to make sure you comply and not interfere with EPA. So there's provisions throughout CERCLA that say no matter what your defenses may be, you always are on the hook to not do anything to interfere with EPA's remedy. And I just gave you different sites. So on PRPs, in terms of this is a status and not a financial liability, EPA, they're always liable under 106 for abatement, and they're always liable in a suit by Atlantic Richfield when the cleanup ends under Section 113G2A. We might not get much money, but they're definitely on the hook. But the real question is one of status, and it's, Justice Gorsuch and Justice Kavanaugh, you were wrong on this as being a question of who has to sue and a burden. EPA would have no way of knowing. They only know in this case and wrote them a letter because there's a lawsuit in a Supreme Court case in the state of Montana. But there are hundreds of thousands of people who live on Superfund sites with uranium, and God knows what else. And how is EPA exactly supposed to know when someone is removing uranium? It has a half-life of 4.7 billion years. Arsenic has no half-life. It always is there. It cannot be destroyed. It doesn't evaporate. So, yeah, they have some restrictions before they move hazardous waste. The other thing is in terms of who you'd have to sue, I would freak out if I got a letter. Their view is you have to sue these poor, innocent landowners and say you're liable under CERCLA, just so you know. It's the only way we can keep control of the site. That's the only way we're going to know, and then, you know, now they're on notice. Because otherwise you would have this metaphysical thing of who knows who's liable. In terms of the taking issue, and I think that Justice – I mean, you guys already answered this, but this is really a question of do you have to go to EPA. If EPA denies permission and they want to bring a takings claim, go sue EPA. There's also a citizen-suit provision. In 2025, they can bring a lawsuit and say, EPA, your remedy was terrible. We don't like it. It violated CERCLA. Come up with a new one. That's what the citizen-suit provision is for. On the mousehole point, I don't think it's a mousehole. So it has mouses or elephants, I guess, all the way in the statute. There are provision after provision in the contiguous landowner, in the microminimus or whatever that word is, in the bona fide landowner that says at all times you have to make sure you don't interfere with EPA's remedy. Thank you. Thank you, counsel. The case is submitted.